IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 14, 2010

**WILLIE DOCKINS v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-26256      John T. Fowlkes, Jr., Judge**

_____

**No. W2008-02809-CCA-R3-PC  - Filed January 31, 2011**

_____

A jury convicted the petitioner, Willie Dockins, of first degree murder.  The trial court sentenced him to life imprisonment with the possibility of parole.  On direct appeal, this court upheld the conviction and sentence.  The petitioner filed a *pro se* petition for post-conviction relief and two amended petitions for post-conviction relief alleging ineffective assistance of counsel at trial and on direct appeal.  The post-conviction court denied relief, and the petitioner now appeals.  Following a review of the parties' briefs, the record, and applicable law, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Jerri D. Mauldin (on appeal) and John Parker (at trial), Memphis, Tennessee, for the appellant, Willie Dockins.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; William L. Gibbons, District Attorney General; and Rachel Newton, Tracye Jones and Tom Hoover, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Background**

A Shelby County grand jury indicted the petitioner, Willie Dockins, for one count of first degree murder.  Before the petitioner's jury trial, the court held a competency hearing.

The evidence at the hearing, as summarized in this court's opinion on direct appeal, was as follows:

Dr. Samuel Craddock, a clinical psychologist from the Middle Tennessee Mental Health Institute, testified during the competency hearing that he evaluated [the petitioner] during the period from April 21 to May 14, 1998. After evaluating [the petitioner], Dr. Craddock formed the opinion that [the petitioner] was competent to assist counsel and further, there would be no basis for asserting an insanity defense at trial. Dr. Craddock also evaluated [the petitioner] on the morning of the competency hearing[,] and Dr. Craddock found no substantial change in [the petitioner]'s condition.

On cross-examination, Dr. Craddock acknowledged that Dr. Wyatt Nichols had concluded that [the petitioner]'s competency and sanity were "questionable." However, Dr. Craddock also noted that [the petitioner] had been uncooperative at the time of Dr. Nichols' evaluation and as a result, the assessment could not be completed. Dr. Craddock also testified that even if [the petitioner] was hearing voices as he claimed, that would not interfere with his ability to concentrate, function, or participate at trial.

[The petitioner] testified that he had been hearing the voice of the victim and the victim had even visited him in his cell. [The petitioner] also testified that he had attempted to commit suicide.

A letter submitted to the trial court from Larry Southard, Director of Forensic Services for the Middle Tennessee Mental Health Institute, states that after completing an evaluation, the clinical staff was of the opinion that [the petitioner] is able to "adequately assist in his defense in a court of law." The staff based this determination on findings that [the petitioner] "does understand the charges pending against him and the consequences which may follow and he is able to advise counsel and participate in his own defense." In addition, the staff concluded that a defense of insanity could not be supported in this case.

At the conclusion of the competency hearing, the trial court found that [the petitioner] was competent to stand trial. The trial court stated that it appeared from [the petitioner]'s testimony that he was "competent and knowledgeable of his circumstances and the background of the case and his situation." The trial court also noted that it was apparent that [the petitioner]

understood that he had not actually heard the voice of the victim and instead, such occurrences were simply nightmares.

*State v. Willie Dockins*, No. W1998-00354-CCA-R3-CD, 2000 WL 763965 at *4-5 (Tenn. Crim. App. at Jackson, June 8, 2000).

This court's opinion on direct appeal summarized the evidence at the petitioner's jury trial as follows:

Jewell Rogers testified that on January 26, 1996, she was living in a house on Leath Street with her granddaughter Jewell Jones, the victim in this case. That same date, Rogers took the victim to a dance at school. The victim subsequently returned to the home on Leath Street, where Rogers saw her talking to two young men outside. The victim then came into the house and stated that she had been shot. Shortly thereafter, the victim fell into Rogers' arms and Rogers could see that she had blood coming out of her mouth. The victim died a short time later.

Matoya Perry testified that she was a friend of the victim. While Perry was at a school dance on January 26, 1996, she observed an altercation between her cousin and the co-defendant, Jerry Jones. When Perry subsequently went outside, the co-defendant took his shirt off and approached her "like he was ready to fight." At this point Perry put her coat down and she was immediately stabbed by the co-defendant's sister. Perry then began fighting with the co-defendant's sister. After the fight ended and Perry attempted to leave the school parking lot, the co-defendant approached Perry with a gun. Perry and a nearby group of individuals ran away and Perry eventually reported the incident to the police.

Travis Davidson, the victim's cousin, testified that after the school dance on January 26, 1996, he observed two crowds in an area where some individuals were "throwing blows," but he could not identify the individuals. Davidson also observed the co-defendant run up the street and yell that he was going to get a gun. Davidson could also see that the co-defendant was not wearing a shirt and his face was bleeding. At this point, Davidson and the victim ran to their grandmother's house.

Davidson testified that a group consisting of [the petitioner], the co-defendant, and some other individuals subsequently came to his grandmother's house and began asking questions about somebody with whom

-3-

they had been fighting. The group left, but [the petitioner] and the co-defendant subsequently returned to the house. Davidson eventually went in the house while the victim remained outside with [the petitioner] and the co-defendant. Davidson then heard a boom and when he looked outside, he saw [the petitioner] and the co-defendant running away.

DaRobert Jones, Davidson's brother, testified that after the dance at the school, he was involved in a fight between the Leath Street group and the Scutter Field group. Jones observed that while he was fighting on behalf of the Leath Street group, the co-defendant was fighting on behalf of the Scutter Field group. Jones subsequently left the fight when "[s]omebody screamed out in the crowd that they were going to get a gun."

Jones testified that after the fight, he went to his grandmother's house. Jones subsequently observed the victim outside talking to the co-defendant and an individual who was wearing a skull cap. Shortly thereafter, Jones heard a "pow" and when he looked outside, he saw the "guy with the skull cap running with a gun in his hand" along side the co-defendant. Jones noticed that the gun was a chrome revolver.

Marcus Pearson testified that he observed the fight after the school dance and he saw "some boys off Leath Street" jump on the co-defendant and injure him. Pearson subsequently went with [the petitioner], the co-defendant, and two other individuals to Leath Street in order to obtain the names of the people who had injured the co-defendant. The group eventually ended up at the residence of the victim on Leath Street where they had a conversation with Davidson. During the conversation, the group questioned Davidson about the names of the individuals who had been in the fight and they asked Davidson where his brother was. Thereafter, Pearson and the two other individuals parted company with [the petitioner] and the co-defendant. When Pearson left, he heard [the petitioner] say that he was "going to do something bad."

Pearson testified that later that same day, he played basketball with [the petitioner]. At that time, [the petitioner] told Pearson that he had shot the victim after she said something to him. [The petitioner] also told Pearson that immediately before he shot the victim, he told her "it ain't going to be nothing, [B****]." Pearson also saw [the petitioner] with a revolver that had a purple handle.

-4-

Michael Tart testified that he assisted the co-defendant in the fight after the school dance. After the fight, Tart accompanied the co-defendant to his house, where the co-defendant retrieved a silver gun with a purple handle. Tart then saw Pearson approach the residence and he heard Pearson say, "let's go get them." The co-defendant and Pearson then attempted to leave, but they were stopped by the co-defendant's mother.

Tart testified that after the co-defendant's mother left, a group consisting of [the petitioner], the co-defendant, Tart, Pearson, and another individual formed and eventually left the residence. When Tart began walking away from the group, [the petitioner] stated, "if you ain't with us, you without us." Tart then rejoined the group and the group went to the home of the victim's grandmother. When the group arrived, they asked for Davidson to come outside and when he refused, [the petitioner] "got mad" and stated, "we need to quit bull-[sh****ng] around." Tart then became confused because he believed that the group's purpose was to "fight and get some names."

Tart testified that at this point, the group started to walk away. [The petitioner] then told three members of the group to leave, and he asked the co-defendant for a gun. The co-defendant then reached into his pocket and shortly thereafter, Tart saw [the petitioner] holding a silver gun with a purple handle. As Tart and the others left, he saw [the petitioner] and the co-defendant walking back in the direction of the victim's residence. Tart subsequently heard a gunshot.

Tart testified that [the petitioner] had repeatedly asked the co-defendant for the gun before the shooting. Tart was not sure why [the petitioner] had joined the group, other than "[the petitioner] just came by to be nosey and to start something at the time."

Roosevelt Taylor testified that he was with the group that went to the residence of the victim on January 26, 1996. Before they got to the house on Leath Street, Taylor observed that the co-defendant was holding a chrome gun. Taylor left the group after they arrived at the house, but he encountered [the petitioner] a short time later. At that time, [the petitioner] gave Taylor the gun and told Taylor to "get rid of it." [The petitioner] stated that he had shot the victim in the chest. [The petitioner] also told Taylor that "he was trying to get the boy to come out the house, and the boy wouldn't come out the house. So he shot the girl in the chest."

Taylor testified that after [the petitioner] gave him the gun, he colored the handle blue and hid it in his sister's residence. Taylor's sister subsequently gave the gun to the police.

Officer Cham Payne of the Memphis Police Department testified that he recovered the gun in this case. All parties stipulated that the bullet recovered from the body of the victim was fired from the gun.

Dr. Wendy Gunther testified that she performed an autopsy on the body of Jewell Jones. During the autopsy, Dr. Gunther observed that there was one bullet wound on the left breast and Dr. Gunther recovered one bullet from the body. Dr. Gunther opined that the victim died from a gunshot wound through the heart. Dr. Gunther also opined that the bullet's path was consistent with a gun pointed at the chest.

Sergeant Ottis Stewart of the Memphis Police Department testified that he interviewed the co-defendant as part of his investigation of this case. During the interview, the co-defendant stated that he was with [the petitioner] when [the petitioner] shot the victim with a chrome revolver that had a purple handle. The co-defendant also stated that before [the petitioner] shot the victim, he heard [the petitioner] say, "There ain't no love lost."

Lieutenant A.M. DeWitt of the Memphis Police Department testified that he interviewed [the petitioner] as part of his investigation of this case. During the interview, [the petitioner] stated that when he learned that the co-defendant had been in a fight and Tart had failed to assist the co-defendant, he became angry and stated, "Man, I'll help you fight. I'll come up there everyday after school and help you fight." [The petitioner] also stated that Taylor and Pearson then said, "We need to get clicked up, to get some more N-----s, and fall on Leath Street and take care of our business." [The petitioner] stated that in response, he told the co-defendant that he would go with him. [The petitioner] admitted in his statement that the reason he and the other members of the group went to Leath Street was to "fight the boys who jumped on [the co-defendant] because they all lived on Leath Street." [The petitioner] also stated that when the group arrived at Leath Street, Pearson said, "One of the dudes live right here and his name is Travis." [The petitioner] stated that the group then questioned Davidson about the fight, and Davidson denied fighting the co-defendant. [The petitioner] also told the police that after Davidson went back in the house and came back out, [the petitioner] told him "You-all need to quash this [sh**]," and he told Davidson

-6-

to shake the co-defendant's hand. [The petitioner] stated that when Davidson refused to shake the co-defendant's hand, [the petitioner] "told that little dude Travis that he making it seem like it ain't through with the situation."

[The petitioner] testified that while he and the co-defendant were walking to the home of the victim on Leath Street, he confiscated the gun from the co-defendant in order to avoid getting into trouble. [The petitioner] also testified that while he was talking to the victim, he accidently dropped the gun. When the victim questioned [the petitioner] about the gun, [the petitioner] picked up the gun and pulled the trigger in order to show the victim that the gun was not loaded, which caused the gun to fire accidentally. [The petitioner] and the co-defendant then ran away from the scene.

[The petitioner] testified that even though the victim screamed when the gun was fired, he was not aware that he had shot her. [The petitioner] admitted that after he ran from the scene, he gave the gun to Taylor because he "didn't want to get caught with the weapon."

[The petitioner] admitted that when he gave his statement to the police after the shooting, he lied to them when he stated that the co-defendant was the one who shot the victim. [The petitioner] testified that he lied to the police "so it make [him]self look innocent."

*Id.* at *1-4.

The jury convicted the petitioner of first degree murder, and the trial court subsequently sentenced him to life imprisonment in the Tennessee Department of Correction. The petitioner appealed his conviction to this court, and we affirmed the judgment of the trial court. *Id*. at *1.

On March 19, 2002, the petitioner filed a *pro se* petition for post-conviction relief alleging ineffective assistance of counsel. The trial court appointed post-conviction counsel who filed two amended petitions for post-conviction relief. The post-conviction court held hearings on the merits of the petitions on August 25 and November 16, 2006.

During the hearings, the petitioner testified that he was serving a sentence of life with the possibility of parole for his first degree murder conviction. Trial counsel represented the petitioner during his trial and on appeal. The petitioner stated that he filed a petition for post-conviction relief raising the issues of ineffective assistance of counsel and "other problems that [he] had with [trial counsel]'s representation of [him]."

The petitioner testified that one problem that he had with his trial counsel was that he was "inadequately prepared to testify" because trial counsel "did not take the time to prepare [him] for [his] testimony." The petitioner felt that trial counsel's placing him on the stand to testify unprepared damaged his case more than it helped it because "[he] had self-incriminated [himself] in regards to what happened and [trial counsel] didn't investigate and take time to locate witnesses [who were] available to corroborate [his] testimony." He said that trial counsel did, however, have an investigator to help him with the case.

According to the petitioner, trial counsel should have interviewed witnesses, such as his co-defendant's mother, Ms. Jones, who could testify to his "presence of mind and intent." He stated that he intended to go to the victim's home to get the names of the people who had assaulted the co-defendant so Ms. Jones could report them to the police. The petitioner said he understood that, legally, he could have formed his intent in an instant; however, he also said that Ms. Jones's testimony would have rebutted the state's argument that the petitioner went to the victim's home to "seek revenge or retaliate." He stated that he did not obtain the gun until the group arrived at the victim's home.

The petitioner recounted how he shot the victim and repeated that he did not think that the gun was loaded because his "co-defendant [was] playing with a gun with no bullets in it." He stated that, at trial, no one testified that the gun was not loaded, but Mr. Pearson and Mr. Tart, both of whom the state called as witnesses, could have testified in that regard. The petitioner stated that trial counsel asked Mr. Pearson whether the gun was loaded during cross-examination, and Mr. Pearson said that it was not.

The petitioner testified that he also had a problem with how the state presented the gun at trial. He explained that

> [t]he problem that [he] had with the weapon presentation was [that] only the frame was presented[,] . . . and the cylinder was not included with the frame. And by the cylinder being left out, it undermined my defense and my contention that . . . I was led to believe that the gun was unloaded . . . because by the cylinder not being included with the frame, I couldn't show where the latch was broken off . . . and . . . how you can look into the cylinder.

The petitioner said that he did not remember that the frame of the gun did not have the cylinder until after he had finished testifying. He also said that trial counsel attempted to address the issue in his motion for a directed verdict, which the court denied. According to the petitioner, the court denied the motion for a directed verdict because trial counsel "didn't get a chance to get a proper understanding of what [he] was trying to say and explain to him."

The petitioner said that he understood that the trial judge wanted the state to present the gun in two pieces, but the second piece, which was the cylinder, was not in the courtroom "period." The petitioner stated that he felt the ballistic examiner's testimony would have corroborated his testimony that he did not believe the gun was loaded. Trial counsel did not call a witness to testify about the gun. During the trial, the state entered into evidence photographs of the gun in its complete state, but the photographs did not show the missing latch.

The petitioner said that during the pendency of his trial, doctors from Midtown Mental Health and the Middle Tennessee Mental Health Institute performed mental examinations on him. The Middle Tennessee Mental Health Institute was in Nashville, and the petitioner stayed there for thirty days. When the petitioner came back to Memphis for his trial, the doctors said that he was competent to stand trial, and he was able to assist trial counsel in the presentation of his defense.

The petitioner neither received the records from his evaluation nor discussed the evaluation with trial counsel. The petitioner said that trial counsel was upset that nobody had consulted him regarding the petitioner's mental health. The petitioner told trial counsel that he had been admitted to facilities when he was around eight or nine years old because of hyperactivity. The petitioner also told trial counsel that he had attempted suicide because he heard voices while incarcerated in the county jail.

In the petitioner's motion for new trial, the petitioner asserted that the court should have declared him incompetent to stand trial. After trial, the petitioner and trial counsel did not discuss the petitioner's mental health records, visit to the Middle Tennessee Mental Health Institute for treatment, psychological and mental problems, or his trial testimony. He said that after the court announced the jury's verdict, the only thing that trial counsel said was that the petitioner "did the best [he] could" and that he would see him at the sentencing hearing. The petitioner felt that he did the best that he could "[u]nder the circumstances." He explained that he "wasn't prepared. [He] wasn't instructed what to say or how to present it and how to tell it."

Before trial, the petitioner told trial counsel his version of the events, but they did not discuss how they would present that information to the jury. The petitioner agreed that "all [he] knew is that [he was] going to go to trial and [trial counsel] was going to defend [him] . . . ." Trial counsel gave the petitioner a copy of the discovery in this case, and the petitioner said that it only contained his and his co-defendant's statements. The petitioner was unaware of who would be testifying against him and that the witnesses had given inconsistent statements that the petitioner's co-defendant had committed the crime. The petitioner stated, however, that trial counsel "did the best that he could" when he cross-examined the witnesses

about their inconsistent statements. The petitioner did not tell trial counsel about any potential witnesses or people to whom he should speak. The petitioner stated that he "explained the situation [and] how everything had transpired" to trial counsel.

While incarcerated, the petitioner contacted the victim's grandmother, Ms. Rogers, through phone calls and letters. The state used the letters during the competency hearing to show that the petitioner was competent to stand trial, and Ms. Rogers testified about the phone calls and letters at the petitioner's trial. The petitioner did not understand how the court could have allowed the state to use the letters that he had written to Ms. Rogers to establish his competency but not allow the petitioner to use them to show his intent at the time of the crime.

The petitioner testified that he had a problem with the jury instructions in this case. He stated that the jury instructions "included the nature of the conduct, the circumstances surrounding the conduct, and the result of the conduct. But in [*State v. Page*], it was clearly outlined that all homicide cases are a result of conduct." The petitioner said that his instruction was improper because the jury was only supposed to consider his intent and the result of his conduct, not the nature of the conduct and the circumstances surrounding it. He further said that the jury instructions "shifted the burden of proof from the State onto [the defense.]" Upon questioning from the post-conviction court, the petitioner stated that trial counsel did not ask for the jury instructions to which the petitioner was objecting. He said that the trial court gave the jury their instructions; however, trial counsel did not object to the instructions. The petitioner said that "[a]ccording to [*State v. Page*] . . . jury instructions have been applied incorrectly since [the] 1989 sentencing penal code." Trial counsel did not include the allegedly erroneous jury instructions in the petitioner's direct appeal.

The petitioner testified that the state incorrectly used a misdemeanor conviction to attack his credibility during trial. He said that the rules of evidence state that parties may only use a conviction for which a defendant served more than a year in the state penitentiary to attack credibility, and his conviction was a misdemeanor for which he served thirty days.

Trial counsel represented the petitioner during his direct appeal. The petitioner stated that trial counsel did not cite any authorities to support his arguments on appeal, which resulted in the appellate court waiving his claims. The petitioner was unhappy with trial counsel's performance on appeal "because from [his] understanding[,] he [was] supposed to have representation of counsel during all critical stages, and [he had] a right to adequate counsel during [his] first appeal of a right."

On cross-examination, the petitioner testified that he spoke with trial counsel "between four to seven times" before trial. He said that during that time, trial counsel never

advised him that he did not have to testify. The petitioner stated that he did not tell trial counsel what he wanted him to say on his behalf during the trial.

The petitioner wanted trial counsel to assert as a defense that the petitioner was incompetent when he committed the offense. The petitioner agreed that doctors had evaluated him before the competency hearing, but he disagreed that he refused to cooperate with one doctor. He said that, "[f]rom his understanding," the doctors stated that he was "agitated and hostile in his responses."

Regarding the presentation of the gun, the petitioner said that he did not tell trial counsel about the missing cylinder until after he had finished testifying. He said that trial counsel included the issue of the state's presentation of the gun in his motion for new trial. According to the petitioner, the trial judge "probably decided" that the issue of the state's presentation of the gun was not important because trial counsel did not understand what the petitioner told him about the gun.

The petitioner stated that he had two attorneys who represented him before trial counsel. He denied that one attorney who prepared him for trial before trial counsel represented him told him that he had a choice whether to testify at trial. The petitioner also denied telling trial counsel that he wanted to testify.

Patricia Jones testified that she was the mother of the petitioner's co-defendant. She stated that on the day of the offense, her son had come home upset because some children had "jumped on him and his sister." Ms. Jones spoke with police officers, and they advised Ms. Jones to get the names of the children who had assaulted her children. She said that she wanted the co-defendant to stay inside of the house, but she discovered he had left the house when she went to take some food to her friend's mother. Ms. Jones saw the co-defendant dancing in the street with the petitioner standing nearby. She asked the co-defendant what he was doing, and he told her that he was going to get the names of the children who had jumped him. Ms. Jones did not observe any problems and said no one was around. Ms. Jones went to deliver the food, and when she came back, ambulances and police cars were around the area where she had seen the co-defendant and the petitioner. Ms. Jones testified, on cross-examination, that she did not see the shooting.

Trial counsel testified that he had been licensed to practice law in Tennessee for thirty-two years. He estimated that 50 percent of his practice was criminal. The court appointed trial counsel to represent the petitioner because of a conflict with the public defender's office. Trial counsel spoke with the petitioner in the courtroom the day the court appointed him to the case. After speaking with the petitioner, trial counsel spoke with the

petitioner's previous attorney who had been on the case for several months. Trial counsel also made copies of the previous attorney's file.

In preparation for trial, trial counsel met with the petitioner several times. Trial counsel stated that the petitioner's mental evaluations delayed the trial multiple times, but they did not affect his trial strategy. He spoke with the petitioner "at least eight or nine times" during the pendency of the case. Trial counsel said that he advised the petitioner that he had the right not to testify. He also said that he and the petitioner prepared for trial and rehearsed the petitioner's testimony. He stated that he told the petitioner that aside from the petitioner's testimony, other possibilities for showing proof of the petitioner's intent existed; however, he later testified that "there weren't really any alternatives to [the petitioner's] intent . . . . Only he could testify to that."

Trial counsel stated that from the beginning of his representation of the petitioner, the petitioner had said that he wanted to testify. Trial counsel said that the petitioner and the victim were the only witnesses to the shooting, and the other witnesses were there before or after the shooting. Trial counsel was aware of Mr. Pearson, Mr. Tart, and Mr. Taylor. He saw their statements and spoke with them. Trial counsel said that they did not contribute anything to the petitioner's case other than their statements. Trial counsel was not aware of any other witnesses who would have known about the incident.

Trial counsel visited the crime scene and said that it "indicated that there was a possibility" that the gun was unloaded as the petitioner thought. Trial counsel explained, "The medical proof came in, showing an upward trajectory of the bullet through . . . the left shoulder on upward just grazing the heart. That seemed to indicate and seemed to show a lot of semblance to [the petitioner's] testimony . . . ." Trial counsel stated that this case hinged on factual issues rather than legal issues.

Regarding the presentation of the gun, trial counsel testified that he "remembered the gun was disassembled, and [he] thought it showed [that] . . . it was a gun that was falling apart, basically. It was an older gun that had been found that day and [he] didn't see any problem with that." He further testified that the state's showing the gun in that condition made it easier for him to argue the petitioner's version of events.

Trial counsel stated that regarding his investigation and presentation of the petitioner's mental condition, the petitioner's direct testimony established that he had received social security disability benefits for mental disability. The evaluation performed in Memphis, Tennessee, was inconclusive so the petitioner had an evaluation done in Middle Tennessee. There was a pretrial competency hearing; however, trial counsel stated that, to his knowledge, the parties did not bring the issue of the petitioner's competency before the jury.

-12-

Trial counsel spoke with the petitioner's mother about testifying about the petitioner's mental condition at trial. He stated that "to the best of [his] knowledge," the petitioner's mother would not come for the petitioner's trial. Trial counsel said that he had her under a subpoena, and she eventually agreed to attend the trial. According to trial counsel, the petitioner's family was uncooperative despite his efforts, and he had to purchase clothes for the petitioner to wear during trial because his family would not bring clothes for him.

Trial counsel said that he could not remember the petitioner's appeal. He said that he and the petitioner "talked about the weight of the proof mainly and that was about the only issue [they] presented" because the case was "fact driven." Trial counsel testified that he did not believe the outcome of the petitioner's case would have been different had he handled the case differently.

On cross-examination, trial counsel stated this his paralegal spoke with Mr. Pearson, Mr. Tart, and Mr. Taylor. The paralegal went to the crime scene, but trial counsel was unaware whether he spoke with anyone. He said that if the paralegal had spoken with someone, it would have been in his presence. Trial counsel did not speak with Ms. Jones and, initially, was unaware of whom she was. After reviewing some documents, trial counsel recalled who Ms. Jones's was. He remembered that Ms. Jones was at the crime scene. He stated that the information that Ms. Jones provided to the investigator was consistent with her testimony at trial and what the petitioner had said happened. Trial counsel could not say whether Ms. Jones testimony would have helped the defense.

Trial counsel said that the petitioner described the gun used in this case as a "[p]ainted blue . . . older gun." Trial counsel did not recall the gun having any missing parts. He likewise did not recall how the state presented the gun at trial but stated that he thought "it was in three pieces." Trial counsel said that the petitioner asked him on the day of the motion for new trial to add the issue of the state's presentation of the pistol. Trial counsel "didn't really understand what [the petitioner] was saying, but [he] did add that for the record." He said that the entire time he represented the petitioner, the petitioner told him that he did not believe the gun was loaded when he shot the victim.

Trial counsel stated that he requested a mental evaluation of the petitioner because the petitioner had received social security disability. Trial counsel did not receive any records from the petitioner's evaluation in Middle Tennessee until the day of the competency hearing, but he could not recall whether he had requested them before then. Trial counsel stated that although he got the records that day, the trial court gave him sufficient time to review them. He further stated that nothing in the petitioner's mental health evaluation records caused him to question the petitioner's condition or mental health.

-13-

When asked whether the doctors' noting that the petitioner was "isolated [and] withdrawn" would affect the petitioner's ability to testify at trial, trial counsel responded that the petitioner "took over the court that day. That's the way he testified." Trial counsel stated,

> I explained to [the petitioner] ahead of time that I would be standing next to the jury box for two reasons; one, so that I could make sure I could hear him, therefore the jury could hear him; and two, so he could look the jurors in the eyes as he testified face-to-face and look at me at the end of the jury so that I can hopefully give him some signals and try to lead him through his testimony.

Trial counsel said that the petitioner went on "continuously" while testifying. While testifying about why he did not think that the gun was loaded, the petitioner drew a diagram to show the jury how the shooting happened. According to trial counsel, the petitioner was "[v]ery calm, cool[,] and collected" while testifying. Trial counsel stated that the petitioner "gave a bad impression to the jury in his attitude while he took over the courtroom."

Trial counsel recalled the letters that the petitioner wrote to Ms. Rogers. Trial counsel thought they had used the letters during the competency hearing but could not recall whether the parties used them during the trial. He said that the petitioner's letters were about dreams he had about the victim and apologies to Ms. Rogers. Trial counsel said that the state may have used the letters during Ms. Rogers's testimony. He said the petitioner wanted the letters as evidence during the trial; however, he did not remember whether he filed a motion in limine to have the court exclude the letters as evidence.

Trial counsel said that he was sure he did research for the petitioner's appeal, but he could not specifically recall at the hearing. Trial counsel thought that "the main thrust of the argument was the weight of the evidence." He did not know whether he cited any case law to support the argument, but he assumed that he did. He also "assume[d]" that if he did not cite to case law in his appellate brief then the court would deem the issue waived but did not know for certain.

Trial counsel believed that he stipulated that the bullet that killed the victim came from the gun that the state introduced as an exhibit. Trial counsel did not recall whether he spoke with the person who tested the gun. He stated that, normally, he would keep records and information from his investigation of a case in his file, but he moved in 2000 and discarded some records.

-14-

Trial counsel did not think that he subpoenaed witnesses for the defense. He said that the witnesses who testified for the state about the event surrounding the shooting "were good defense witnesses" although the defense did not call them.

On redirect examination, trial counsel testified that he and the petitioner decided that their "game plan" would be for the petitioner to admit everything except that he intended to shoot the victim. Trial counsel said that they wanted to establish the angle at which the bullet entered the victim, the petitioner's theory, and the petitioner's testimony for the jury. He further said that to succeed in establishing their position, which he believed they did, the petitioner had to admit to shooting the gun. He stated that the petitioner's testimony did not surprise him until "[the petitioner] became[,] in [his] opinion[,] very confident at the start of his testimony and then he was pretty well torn up during the cross-examination." Trial counsel testified that he felt "adequately prepared in handling the competency hearing" and that, generally, the issues in a competency hearing are uncomplicated.

Trial counsel said that he did not subpoena any witnesses for the trial because the state called all relevant witnesses. He read the statements of other witnesses who the state did not call as witnesses and said there were no surprises during the trial. Trial counsel stated that the state offered the petitioner a plea agreement; however, the petitioner refused to accept it. Trial counsel felt that he "did everything he could to represent the petitioner to the fullest of [his] abilities" and stated that he was "very disappointed in the verdict. [He] thought it was a winnable case, [and] it could have gone either way."

After hearing the proof, the post-conviction court took the matter under advisement. On November 13, 2008, the post-conviction court entered an order denying the petition for post-conviction relief. In its order, the court found that the petitioner failed to show that counsel was ineffective at trial or on appeal. The petitioner appeals the court's denial of post-conviction relief.

**Analysis**

On appeal, the petitioner argues that trial counsel was ineffective at trial for failing to (1) sufficiently investigate and prepare for the testimony of trial witnesses; (2) make meaningful objections at trial to the state's presentation of evidence; (3) properly investigate and present his mental condition before and during the offense; (4) adequately and fully advise him of his right not to testify; (5) request appropriate and adequate jury instructions; and (6) file an adequate and effective appellate brief on his behalf.

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations of fact set forth in his petition by clear and convincing evidence. Tenn.

Code Ann. § 40-30-110(f). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns,* 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings, such as findings concerning the credibility of witnesses and the weight and value given their testimony, is *de novo* with a presumption that the findings are correct. *See id.* Our review of the post-conviction court's legal conclusions and application of law to facts is *de novo* without a presumption of correctness. *Fields v. State,* 40 S.W.3d 450, 457-58 (Tenn. 2001).

To establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State,* 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland,* 466 U.S. at 688; *see also Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). A fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689; *see also Nichols v. State,* 90 S.W.3d 576, 587 (Tenn. 2002). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad v. State,* 938 S.W.2d 363, 369 (Tenn. 1996). Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland,* 466 U.S. at 694. Both deficient performance and prejudice must be established to prove ineffective assistance of counsel. *Id.* at 697; *see also Goad,* 938 S.W.2d at 370. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Strickland,* 466 U.S. at 697.

*1. Failure to sufficiently investigate and prepare for the testimony of trial witnesses*

The petitioner first contends that trial counsel "failed to sufficiently investigate and prepare for testimony of witnesses at trial, including but not limited to Marcus Pearson, Michael Tart[,] and Roosevelt Taylor." The petitioner claims that he was unaware of what these witnesses' testimony would contain, and trial counsel should have provided their statements to him.

The post-conviction court found that trial counsel "was prepared for the testimony of all witnesses presented by the state during the trial of this matter" and that the "[p]etitioner has failed to prove that trial counsel's failure to call Ms. Jones prejudiced his case." The court further found that the petitioner failed to show that counsel rendered deficient performance or that counsel's performance prejudiced him. Trial counsel's testimony, which the post-conviction court clearly accredited, established that trial counsel not only reviewed the statements of Marcus Pearson, Michael Tart, and Roosevelt Taylor, he also spoke with each witness before trial. The petitioner testified at the post-conviction hearing that trial counsel "did the best that he could" when cross-examining these witness. Furthermore, even if we conclude that counsel was deficient for failing to sufficiently investigate potential witnesses, the petitioner did not present Marcus Pearson, Michael Tart, Roosevelt Taylor, or any other witnesses, besides Ms. Jones, at the post-conviction hearing. The presentation of witnesses at the post-conviction hearing is generally necessary to prove that counsel's failure to present evidence resulted in prejudice to the petitioner. *See Black v. State,* 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Regarding Ms. Jones, the petitioner testified that she could have testified regarding his intent to discover the names of the children who had jumped his friend. However, as the post-conviction testimony established, Ms. Jones was not present at the time of the shooting, and the petitioner agreed that "the law says that intent can be formed in an instant." Thus, not having Ms. Jones testify at his trial did not prejudice the petitioner. We conclude that nothing in the record preponderates against the post-conviction court's findings that the petitioner failed to show deficiency or prejudice. The petitioner is not entitled to relief on this issue.

*2. Failure to make meaningful objections at trial to the state's presentation of evidence*

Next, the petitioner argues that trial counsel "failed to make meaningful objections to the [s]tate's presentation of its evidence against [the petitioner], including the presentation of the gun in a disassembled state." The petitioner claims that it was important for the state to present the gun assembled to corroborate his version of events. Trial counsel testified that he thought the state's presentation of the gun in a disassembled state showed that the gun "was falling apart" and "was an older gun," which supported the defense's argument that the petitioner accidently shot the victim. In addition, the petitioner did not bring this issue to trial counsel's attention until after his testimony and after the court had admitted the gun into evidence. Despite this late notification, trial counsel included the issue in the motion for new trial. The post-conviction court found that "trial counsel was not ineffective for making a strategic decision to not object to the condition of the gun when it was introduced into evidence." The evidence does not preponderate against the trial court's finding that counsel was not deficient. Moreover, this court, on direct appeal, concluded that the petitioner "failed to demonstrate any prejudice from the manner in which the trial court admitted the gun into evidence." *Dockins*, 2000 WL 763965 at *6. Accordingly, we conclude that the

petitioner has not shown that trial counsel was deficient or that trial counsel's failure to object prejudiced him and is not entitled to relief on this issue.

### 3. *Failure to properly investigate and present the petitioner's mental condition before and during the offense*

For his third issue, the petitioner contends that trial counsel did not properly investigate or present evidence concerning the petitioner's mental state before and during the crime. The petitioner asserts that had trial counsel been prepared for the competency hearing, the petitioner could have been found incompetent to stand trial. Also, the petitioner argues that trial counsel should have called Ms. Jones to testify regarding the petitioner's mental state at the time of the offense.

Trial counsel testified that he requested a mental evaluation of the petitioner after he discovered that the petitioner had received social security disability benefits for mental disability. Trial counsel received the records the day of the competency hearing; however, he said that the court gave him enough time to review them. At the competency hearing, medical testimony showed that the petitioner was competent to stand trial. The petitioner did not present any evidence during the post-conviction hearing that he was incompetent to stand trial. The post-conviction court, noting that doctors from the Middle Tennessee Mental Health Institute reported that the petitioner was competent to stand trial, found that the petitioner failed to show deficient performance by trial counsel or prejudice. The evidence does not preponderate against this finding.

The petitioner further argues that trial counsel was deficient for failing to call Ms. Jones as a witness to corroborate his testimony that he went to the victim's house to get information and did not intend to kill or harm her. Ms. Jones testified that some children had jumped her son, and she needed their names to report to the police. She also stated that her son, who was the petitioner's co-defendant, told her that he was going to get the names of the children who jumped him. According to her, before the shooting there were not any problems and no one was arguing. The post-conviction court found that not having Ms. Jones testify did not prejudice the petitioner, and it accredited trial counsel's testimony that the petitioner's testimony discussed his mental state at the time of the crime. As we stated above, Ms. Jones was not present at the time of the shooting, and the petitioner could have formed his intent in an instant. We conclude that nothing in the record preponderates against the post-conviction court's findings that the petitioner failed to show deficiency or prejudice. The petitioner is not entitled to relief on this issue.

### 4. *Failure to adequately and fully advise him of his right not to testify*

For his next issue, the petitioner posits that trial counsel was deficient for failing to "adequately and fully advise him concerning his right not to testify and similarly to properly prepare him to testify." The petitioner claims that because trial counsel did not advise him that he had the right not to testify and because trial counsel could have presented his case without his testimony, he felt that he had to testify when trial counsel told him he would be taking the stand.

Conversely, trial counsel's testimony was that he and the petitioner prepared for trial and rehearsed the petitioner's testimony. He stated that the petitioner went on "continuously' while testifying and appeared "[v]ery calm, cool[,] and collected." The post-conviction court accredited trial counsel's testimony and found that trial counsel "fully advised [the petitioner] regarding his right to remain silent as well as his right to testify." The post-conviction court further found that trial counsel "properly prepared [the petitioner] for his testimony." Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. *Henley v. State,* 960 S.W.2d 572, 579 (Tenn. 1997). In addition, we afford the findings of fact of the post-conviction court the weight of a jury verdict, and "the findings are conclusive on appeal unless the evidence in the record preponderates against those findings." *Id.* at 578. The record supports the post-conviction court's finding that trial counsel advised the petitioner of his right not to testify and adequately prepared the petitioner for his testimony. Accordingly, we conclude that the petitioner is not entitled to relief on this issue.

*5. Failure to request appropriate and adequate jury instructions*

Next, the petitioner argues that trial counsel "failed to request appropriate and adequate jury instructions including one regarding [the petitioner's] intent." The petitioner asserts that first degree murder is a "result[-of-]conduct crime and as such does not include as an element that the actor engaged in a specified course of conduct to accomplish the specified result." He claims that with the instruction given by the trial court, the jury could have wrongly concluded that the act of pointing a gun thought not to be loaded at the victim could establish conduct that was an intentional killing. In support, the petitioner cites *State v. Page,* 81 S.W.3d 781, 789 (Tenn. Crim. App. 2002), in which this court held that the trial court committed reversible error in failing to instruct the jury that second degree murder committed by a knowing killing of another was strictly a result-of-conduct offense. However, *Page* was decided well after the petitioner's trial, and is thus, inapplicable to trial counsel's conduct. The post-conviction court found that because this court decided *Page* after the petitioner's trial and the instruction regarding the definition of intentional conduct was not erroneous, the petitioner failed to show ineffective assistance. We agree and conclude that trial counsel was not ineffective for failing to object to the jury instructions.

*6. Failure to file an adequate and effective appellate brief on his behalf*

Finally, the petitioner argues that when trial counsel did not cite to authority in his appellate brief, he failed to file an adequate and effective appellate brief. On direct appeal, this court noted that trial counsel failed to cite any authority in support of the issues presented; however, this court did address each issue and ruled on the merits of them. While counsel may have been deficient in failing to cite to authority in the petitioner's appellate brief, this court ultimately considered the merits of claim. Thus, the petitioner has failed to show trial counsel's failure to cite to authority in his appellate brief prejudiced him, and as such, he is not entitled to relief.

## Conclusion

Based on the foregoing, we affirm the judgment of the post-conviction court denying post-conviction relief.

_____
J.C. McLIN, JUDGE